## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | | |
|---|---|---|
| CAMERON HUSTY, Derivatively on Behalf of Nominal Defendant CATALENT, INC., | ) ) ) | |
| Plaintiff, | ) ) | Case No. _____ |
| v. | ) ) ) | JURY TRIAL DEMANDED |
| J. MARTIN CARROLL, MADHAVAN BALACHANDRAN, MICHAEL BARBER, ROLF CLASSON, ROSEMARY CRANE, KAREN FLYNN, JOHN GREISCH, CHRISTA KREUZBURG, GREGORY LUCIER, ALESSANDRO MASELLI, DONALD MOREL, JACK STAHL, PETER ZIPPELIUS, and JOHN CHIMINSKI, | ) ) ) ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| CATALENT, INC., | ) ) | |
| Nominal Defendant. | ) | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Cameron Husty ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant Catalent, Inc. ("Catalent" or the "Company"), against its certain current and former executive officers and members of the Company's Board of Directors (the "Board") for breaches of fiduciary duties, unjust enrichment, waste of corporate assets, and violations of Sections 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available

1

documents, conference call transcripts and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, press releases published by and regarding Catalent, legal filings, news reports, securities analysts' reports about the Company, and other publicly available information.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought on behalf of Catalent against certain current and former officers and members of the Company's Board (collectively, the "Individual Defendants") (defined below) for, among other things, breaching their fiduciary duties to the Company and its stockholders by intentionally or recklessly making or permitting the dissemination of materially false and misleading statements and omissions between August 30, 2021 through October 31, 2022 (the "Relevant Period") regarding the Company's business and finances, as well as the adequacy and maintenance of its internal financial controls.

2.     Catalent is a global provider of drug manufacturing and development, delivery technologies, biologics, gene therapies and consumer health products. In early 2020, the Company experienced rapid growth following the onset of the COVID-19 pandemic. Through its Biologics business segment, the Company was awarded work on more than one hundred COVID-related products, including projects such as filling COVID vaccines into syringes for customers such as Moderna and AstraZeneca.

3.     To keep up with the rapid growth, however, the Company began cutting corners on safety and control procedures at its key production facilities. During the Relevant Period, the Individual Defendants would make or cause to be made materially false and misleading statements concerning the Company's adherence to regulatory rules at these facilities. Specifically, the Company assured investors that it operated its facilities "under rigorous quality

2

and operational standards[,]" and "in accordance with current good manufacturing practices ("cGMP") . . . following our own high standards that are consistent with those of many of our large global pharmaceutical and biotechnology customers."

4.      In reality, when the U.S. Food and Drug Administration (the "FDA") inspected two of these key facilities, it found and cited the Company for significant infractions, including alarming bacterial growth, faulty air filtration systems, subpar equipment maintenance, and control procedure problems. Furthermore, as the *Washington Post* reported, the FDA delayed the release of millions of COVID-19 vaccine booster shots because of potential contamination in vaccine vials filled by Catalent.

5.      By mid-2021, as the COVID pandemic wore on and average daily vaccinations in the United States eventually declined, the Company began to artificially inflate its reported revenues through fraudulent accounting and channel stuffing schemes to mislead investors into believing that Catalent was generating sustainable revenue growth.

6.      Specifically, the Company misrepresented or failed to disclose the following adverse facts: (i) Catalent prematurely recognized, and materially overstated, revenues and earnings in violation of Generally Accepted Accounting Principles ("GAAP"); (ii) Catalent had undisclosed material weaknesses in its internal controls over financial reporting relating to revenue recognition; and (iii) Catalent falsely represented demand for its products while it knowingly sold more product to its direct customers – including AstraZeneca, Bristol-Myers Squibb, GlaxoSmithKline, Johnson & Johnson, Moderna, and Pfizer - than those direct customers could provide to healthcare providers and end consumers.

7.      The truth began to emerge on August 29, 2022, when the Company disclosed that demand for its COVID-related products was facing substantial headwinds. On this news,

Catalent's stock price declined by 7.4%, to close at $92.28 per share that same day. The Individual Defendants, however, continued to make or cause to be made materially false and misleading statements related to Catalent's revenue and earnings, as well as the demand for its products.

8.      On November 1, 2022, the Company lowered its financial guidance and reported that its quarterly earnings had declined to zero, indicating falling demand. The Company also disclosed that regulatory issues at its key facilities were negatively impacting its financial results. On November 16, 2022, Catalent revealed that it was carrying approximately $400 million in excess inventory, further revealing that the Company had misrepresented demand for its products, as well as its purported ability to predict future demand.

9.      On December 8, 2022, stock analyst firm GlassHouse, LLC issued a report, entitled "Accounting Red Flags Plague Catalent, Inc." (the "GlassHouse Report"), more fully revealing the Individual Defendants' efforts to artificially inflate the Company's reported revenues and misstate the Company's true customer demand. Following the release of the GlassHouse Report, Catalent's stock price declined 3.6% to close at $45.54 per share on December 8, 2022.

10.      As set forth herein, the Individual Defendants breached their fiduciary duties by issuing, causing the issuance of, and/or failing to correct the materially false and misleading statements and omissions of material fact to the investing public. As a result, the Individual Defendants caused the Company's public statements to be materially false and misleading at all relevant times.

11.      Additionally, in breach of their fiduciary duties, the Individual Defendants caused the Company to fail to maintain adequate internal controls.

12.     As a result of the foregoing, a securities fraud class action was filed against the Company, Chief Executive Officer ("CEO") and director Alessandro Maselli ("Maselli"), former CEO and director John Chiminski ("Chiminski"), and former Chief Financial Officer ("CFO") Thomas Castellano ("Castellano"), captioned *City of Warwick Retirement System v. Catalent Inc. et al,* Case No. 3:23-cv-01108-ZNQ-DEA (D. N.J.) (the "Securities Action"). The Securities Action has exposed the Company to massive class-wide liability.

13.     In light of the Individual Defendant's misconduct—which has subjected the Company to the Securities Action, the need to undertake internal investigations, the need to implement adequate internal controls over its financial reporting, losses from the waste of corporate assets, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend millions of dollars.

14.     Moreover, in light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action and Defendants' liability in the Securities Action, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested and/or independent directors, a majority of Catalent's Board cannot consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company with the requisite level of disinterestedness and independence. Accordingly, Plaintiff did not make a demand on the Board because, as further detailed herein, demand would be a futile and useless act.

**JURISDICTION AND VENUE**

15.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") over the claims asserted herein for violations of sections 10(b) of the Exchange Act and Rule 10b-5 (17 C.F.R.§240.10b-5) promulgated thereunder by the SEC.

16.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

17.     This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

18.     In connection with the acts, conduct and other wrongs complained of herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

19.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because Nominal Defendant Catalent is incorporated in this District and conducts business in this District.

## PARTIES

*Plaintiff*

20.     Plaintiff is, and has been at all relevant times, a continuous shareholder of Catalent common stock since February 9, 2021.

*Nominal Defendant*

21.     Nominal Defendant Catalent is incorporated under the laws of Delaware with its principal executive offices located in Somerset, New Jersey. Catalent's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "CTLT."

*Individual Defendants*

22.     Defendant J. Martin Carroll ("Carroll") has served as a member of the Board since July 2015 and has served as Chair of the Board since July 2023. Defendant Carroll also serves as Chairman of the Board's Nominating and Corporate Governance Committee and as a member of the Mergers and Acquisitions Committee. As set forth in the proxy statement filed by Catalent with the SEC on September 16, 2022 ("the 2022 Proxy"), Carroll received $320,326 in compensation from the Company in fiscal 2022.

23.     Defendant Madhavan Balachandran ("Balachandran") has served as a member of the Board since May 2017. Defendant Balachandran also serves on the Board's Nominating and Corporate Governance Committee as well as the Quality and Regulatory Compliance Committee. As set forth in the 2022 Proxy, Balachandran received $289,971 in compensation from the Company in fiscal 2022.

24.     Defendant Michael J. Barber ("Barber") has served as a member of the Board since April 2021. Defendant Barber also serves on the Board's Compensation and Leadership Committee as well as the Quality and Regulatory Compliance Committee. As set forth in the 2022 Proxy, Barber received $289,971 in compensation from the Company in fiscal 2022.

25.     Defendant Rolf Classon ("Classon") has served as a member of the Board since August 2014. On December 9, 2022, the Company announced that Classon will retire from the Board as of the Company's next annual meeting in October 2023. Defendant Classon also serves on the Board's Audit Committee as well as the Compensation and Leadership Committee. As set forth in the 2022 Proxy, Classon received $299,971 in compensation from the Company in fiscal 2022.

26.     Defendant Rosemary A. Crane ("Crane") has served as a member of the Board since February 2018. Defendant Crane also serves on the Board's Audit Committee as well as

the Nominating and Corporate Governance Committee. As set forth in the 2022 Proxy, Crane received $299,971 in compensation from the Company in fiscal 2022.

27.    Defendant Karen Flynn ("Flynn") has served as a member of the Board since September 2022 after having served as the Company's Senior Vice President and Chief Commercial Officer since 2021.

28.    Defendant John J. Greisch ("Greisch") has served as a member of the Board since February 2018. Defendant Greisch also serves as Chair of the Board's Audit Committee as well as a member of the Compensation and Leadership Committee. As set forth in the 2022 Proxy, Greisch received $314,971 in compensation from the Company in fiscal 2022.

29.    Defendant Christa Kreuzburg ("Kreuzburg") has served as a member of the Board since February 2018. Defendant Kreuzburg also serves on the Board's Nominating and Corporate Governance Committee as well as the Quality and Regulatory Compliance Committee. As set forth in the 2022 Proxy, Kreuzburg received $289,971 in compensation from the Company in fiscal 2022.

30.    Defendant Gregory T. Lucier ("Lucier") has served as a member of the Board since April 2015. Defendant Lucier also serves as Chair of the Board's Compensation and Leadership Committee as well as a member of the Mergers and Acquisitions Committee. As set forth in the 2022 Proxy, Lucier received $302,471 in compensation from the Company in fiscal 2022.

31.    Defendant Maselli has served as a member of the Board and CEO since July 2022, having previously served as the company's President & Chief Operating Officer since February 2019. As set forth in the 2022 Proxy, Maselli received $3,234,030 in compensation from the Company in fiscal 2022. Defendant Maselli is named as a defendant in the Securities

Action.

32.     Defendant Donald E. Morel, Jr. ("Morel") has served as a member of the Board since November 2015. Defendant Morel serves as Chair of the Board's Quality and Regulatory Compliance Committee. As set forth in the 2022 Proxy, Morel received $301,638 in compensation from the Company in fiscal 2022.

33.     Defendant Jack Stahl ("Stahl") has served as a member of the Board since August 2014. Defendant Stahl serves as Chair of the Board's Mergers and Acquisitions Committee as the Chairman as well as a member of the Audit Committee. As set forth in the 2022 Proxy, Stahl received $318,030 in compensation from the Company in fiscal 2022.

34.     Defendant Peter Zippelius ("Zippelius") served as a member of the Board from May 2019 until his retirement on January 31, 2023 in accordance with the terms of a stockholders agreement between the Company and private equity firm Leonard Green & Partners. As set forth in the 2022 Proxy, Zippelius received $289,971 in compensation from the Company in fiscal 2022.

35.     Defendant John Chiminski ("Chiminski") served as CEO from 2009 until July 1, 2022, and as a member of the Board from 2009 until his retirement on June 30, 2023. As set forth in the proxy statement filed by Catalent with the SEC in 2022 ("the 2022 Proxy"), Chiminski received $12,407,517 in compensation from the Company in fiscal 2022. Defendant Chiminski is named as a defendant in the Securities Action.

36.     Defendants referenced in paragraphs 22 through 35 are herein referred to as the "Individual Defendants."

37.     The Individual Defendants, together with Catalent, are herein referred to as "Defendants."

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

38.     By reason of their positions as officers and/or directors of Catalent, and because of their ability to control the business and corporate affairs of Catalent, the Individual Defendants owed Catalent and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Catalent in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Catalent and its shareholders so as to benefit all shareholders equally.

39.     Each director and officer of the Company owes to Catalent and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

40.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Catalent, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

41.     To discharge their duties, the officers and directors of Catalent were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

42.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of Catalent, the absence of good faith on

their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

43.     As senior executive officer and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

44.     To discharge their duties, the officers and directors of Catalent were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company.  By virtue of such duties, the officers and directors of Catalent were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Catalent's own Standards of Business Conduct (the "Code of Conduct");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Catalent conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Catalent and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Catalent's operations would comply with all applicable laws and Catalent's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above.

45.     Each of the Individual Defendants further owed to Catalent and the shareholders the duty of loyalty requiring that each favor Catalent's interest and that of its shareholders over

their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

46.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Catalent and were at all times acting within the course and scope of such agency.

47.     Because of their advisory, executive, managerial, and directorial positions with Catalent, each of the Individual Defendants had access to adverse, non-public information about the Company.

48.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Catalent.

## CATALENT'S CODE OF CONDUCT

49.     The stated purpose of Catalent's Code of Conduct, titled "Standards of Business Conduct," is to "outline the standards of integrity and responsible conduct that everyone working for Catalent, Inc., including its divisions and subsidiaries ("Catalent"), needs to follow to protect the trust and confidence that our customers, suppliers and investors have in us, regardless of location."

50.      The Code of Conduct begins with a message from Defendant Maselli addressed to employees stating, among other things, that as a public company, "strong governance, risk and compliance systems, and robust financial reporting processes must be clearly demonstrated." The message adds: "At Catalent, what we do matters as does how we do it. We hold ourselves to a very high standard because we believe it is the right thing to do."

51.     The message further instructs employees of the "several ways [they] can voice concerns without fear of retaliation," including through the Company's Ethics & Compliance

13

Business Conduct Helpline. The message assures employees that, through the Helpline, they can confidentially ask questions, report an incident, and check on the status of [their] concern," and that "all concerns are taken seriously and investigated appropriately."

52.     In detailing the responsibilities of all employees, directors and officers, the Code of Conduct states that "[i]f anyone fails to conduct themselves accordingly, they will be considered to be acting outside of the scope of their employment and, as a result, will be subject to discipline, up to and including dismissal."

53.     In a section titled "Business Records & Communications," the Code of Conduct states that all public communications and disclosures in reports and documents Catalent files with or submits to regulatory agencies, including the SEC, "must be made in a full, fair, accurate, timely, and understandable manner."

54.     The Code of Conduct includes examples of suspected misconduct in the form of a Q&A, providing a scenario where an employee may suspect that a manager "reported inflated numbers last quarter to meet the projections, thinking we could make it up this quarter. What should I do?" The response provides that it is "never acceptable to report earnings that are not accurate," and that employees should "[r]eport questionable entries immediately to the Internal Audit or Legal & Compliance departments, or through the Business Conduct Helpline..."

55.     In addition to the Code of Conduct, the Company's "Corporate Governance Guidelines," as amended January 28, 2021, state that the Board, through the Nominating and Corporate Governance Committee, "should conduct a self- evaluation at least annually to determine whether it and its committees are functioning effectively."

## CATALENT'S AUDIT COMMITTEE CHARTER

56.     Catalent's Audit Committee Charter, as amended August 24, 2017, states that the

Audit Committee shall provide assistance to the Board by, among other things, assisting the Board's oversight of the "quality and integrity of the Company's financial statements," and the Company's compliance with legal and regulatory requirements[.]"

57.     In outlining its responsibilities and duties, the Audit Committee Charter states that the Audit Committee, in discharging its oversight role, "is empowered to study or investigate any matter of interest or concern that the Committee deems appropriate."

58.     With respect to responsibilities concerning "Documents/ Reports Review," the Audit Committee Charter states that the Audit Committee shall, among other things:

> 1. Review and discuss with management and the independent registered public accounting firm prior to public dissemination of the Company's annual audited financial statements and quarterly financial statements, including the Company's specific disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."
>
> *           *           *
>
> 3. Review and discuss with management and the independent registered public accounting firm the Company's press releases (paying particular attention to the use of any 'pro forma' or 'adjusted non-GAAP information and measures), as well as financial information and earnings guidance provided to analysts and rating agencies. The Committee's discussion in this regard may be general in nature (i.e., discussion of the types of information to be disclosed and the type of presentation to be made) and need not take place in advance of each earnings release or each instance in which the Company may provide earnings guidance.
>
> 4. Review and discuss with management and the independent registered public accounting firm any major issues arising as to the adequacy and effectiveness of the Company's internal controls, any actions taken in light of material control deficiencies and the adequacy of disclosures about changes in internal control over financial reporting.

59.     The Audit Committee Charter further states that the Audit Committee shall review the integrity of the Company's financial reporting processes. In connection with that responsibility, the Audit Committee must obtain and discuss with management and the independent registered public accounting firm regarding, among other things, "all critical

accounting policies and practices to be used by the Company" and "major issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies."

## SUBSTANTIVE ALLEGATIONS

### Background

60.     Catalent is a contract development and manufacturing organization offering solutions for drugs, protein-based biologics, cell and gene therapies, vaccines, and consumer health products at over fifty facilities across four continents. The Company's offerings include various drug delivery technologies, including pre-filled syringes and vials. Annually, the Company produces nearly 80 billion doses for nearly 8,000 consumer products.

61.     The Company's current operating structure consists of two segments: (i) Biologics, and (ii) Pharma and Consumer Health ("PCH"). The Biologics segment provides manufacturing and development services for, among other things, biologic proteins, cell and gene therapies, and treatments developed from blood, proteins, virus, and living organisms, including COVID-19 treatments. The PCH segment, meanwhile, comprises the Company's capabilities for oral solids and gummy formulations, as well as clinical trial development and supply services.

62.     Catalent's direct customers are typically pharmaceutical companies who ultimately distribute products to healthcare providers and then end-users. The Company's key customers include several of the top branded drug marketers, including AstraZeneca, Bristol-Myers Squibb, GlaxoSmithKline, Johnson & Johnson, Moderna, and Pfizer. The close relationships that Catalent must maintain with its key customers, and the long-term contracts that

result, provide the Company with strong visibility into those customers' needs, particularly the inventory levels required to serve the demand of end consumers.

63.    Long-term contracts with its customers also partially dictate the benchmarks that Catalent must meet in order to recognize revenue. Under GAAP, the Company is required to recognize all revenue on its long-term agreements with customers once the company hits certain objective milestones. Where contracts contain multiple performance obligations, Catalent allocates consideration to each performance obligation using the "relative standalone selling price." Because Catalent recognizes a significant portion of this revenue prior to billing its customers, these contracts are highly susceptible to accounting fraud through premature revenue recognition.

64.    Beginning with the onset of the COVID-19 pandemic, the Company has manufactured or provided services for a variety of products intended for the prevention or treatment of COVID-19 and its symptoms and effects, including both vaccines and treatments. In fact, since 2020, much of Catalent's growth can be attributed to its sale of COVID-related products. According to the Company's quarterly report filed with the SEC on Form 10-Q on November 3, 2020, net revenue and earnings in the Biologics segment for the quarter ended September 30, 2021 increased by 98% and 194%, respectively, over the same period the year prior, in part due to demand for COVID-19 related programs.

65.    In total, the Company has performed work on more than one hundred COVID-19 related products for more than sixty customers, including filling syringes with COVID vaccines for customers such as Moderna and AstraZeneca. Catalent endeavored to expand its facilities to meet the accelerating demand for COVID-19 related drugs.

66.    The rapid expansion of its production capabilities, however, led to problems at

certain key facilities, including a drug product filling and finishing located in Bloomington, Indiana (the "Bloomington Facility") and a syringe filling facility in Brussels, Belgium (the "Brussels Facility"). Both facilities are required to abide by Current Good Manufacturing Practices ("CGMP"), quality controls, and safety regulations that are enforced by the FDA.

67.     On October 26, 2021, following an inspection of the Brussels Facility, the FDA issued an FDA Form 483[1] stating it had found several infractions including faulty air filtration systems, alarming bacterial growth, and subpar equipment maintenance.

68.     On August 19, 2022, following another inspection of the Brussels Facility, the FDA issued a Form 483 detailing problems with air filters and other equipment-related issues.

69.     On September 1, 2022, following an inspection of the Bloomington Facility, the FDA issued a Form 483 identifying several problems at the facility including finding foreign matter, particular matter, and foreign objects and pieces in vials produced at the facility, as well as control procedure problems.

***Materially False and Misleading Statements***

70.     On August 30, 2021, at the start of the Relevant Period, the Company filed with the SEC its annual report for its fiscal year ended June 30, 2021 (the "2021 10-K"). The 2021 10-K was signed by Defendants Chiminski, Balachandran, Barber, Carroll, Classon, Crane, Greisch, Kreuzburg, Lucier, Morel, Stahl, and Zippelius. The 2021 10-K reported that the Company generated $3.998 billion in net revenue and $585 million in net earnings for the fiscal year.

---

[1] An FDA Form 483 is "issued to firm management at the conclusion of an inspection when an investigator(s) has observed conditions that in their judgment may constitute violations of the Food, Drug, and Cosmetic (FD&C) Act and other Acts or regulations. *See* U.S. FOOD AND DRUG ADMINISTRATION, *FDA Form 483 Frequently Asked Questions*, Jan. 9, 2020, (available at https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/inspection -references/fda-form-483-frequently-asked-questions.).

71. In discussing the Company's business, the 2021 10-K reported that Catalent "provide[s] differentiated development and manufacturing solutions for drugs, protein-based biologics, cell and gene therapies, and consumer health products at over fifty facilities across four continents under rigorous quality and operational standards."

72. The 2021 10-K also reported:

> We operate our plants in accordance with current good manufacturing practices ("cGMP") or other applicable requirements, following our own high standards that are consistent with those of many of our large global pharmaceutical and biotechnology customers. We have approximately 1,600 employees around the globe focused on quality and regulatory compliance . . . . We believe our quality and regulatory track record to be a favorable competitive differentiator.

73. Also on August 30, 2021, Catalent issued a press release reporting $1.188 billion in net revenue and $182 million in net earnings for the Company.

74. The same day, the Company also hosted an earnings call with analysts and investors to discuss fourth quarter 2021 results (the "4Q21 Earnings Call"). During the 4Q21 Earnings Call, Defendant Chiminski stated that Catalent observed "vaccines for COVID specifically being really much more of a sustaining and an enduring revenue for Catalent." Defendant Chiminski also stated that Catalent's perspective was that "vaccines [would continue] to play a strong role into the future without any, I would say, substantial cliff in terms of the business since we'll be dovetailing in some of our strong pipeline along with the continued sustained supply required for the COVID vaccine."

75. On November 2, 2021, the Company filed its quarterly report for its first fiscal quarter 2022 (the "1Q22 10-Q") with the SEC. The 1Q22 10-Q stated that Catalent generated $1.025 billion in net revenue and $93 million in net earnings for the quarter.

76. Also on November 2, 2021, Catalent hosted an earnings call with analysts and investors to discuss results from the first fiscal quarter 2022 (the "1Q22 Earnings Call"). During

the call, then-CFO Castellano stated that:

> [The Company continues] to see COVID demand as having a multiyear duration. We're still in the very early stages in terms of worldwide vaccine populations and what we're seeing from a booster demand perspective as well as younger age populations get approved for the vaccine, et cetera, continue to give us confidence that this is going to be around for a multiyear duration, including into the fiscal '23 year.

77.     During the 1Q22 Earnings Call, Defendant Chiminski commented on Catalent's capacity to gauge demand for its key non-COVID-related products. Specifically, Chiminski stated that Catalent had increased "visibility to the customer demand and needs of that business." Defendant Chiminski further stated that the Company's Biologics segment was "driven by continued high demand from COVID-19 projects . . . again the top contributor to Catalent's financial performance," and that "robust net revenue growth was organic and driven by high demand for drug product and drug substance offerings in the U.S. and Europe, most notably for COVID-19 related programs."

78.     On January 10, 2022, Defendant Chiminski spoke at the JPMorgan Healthcare Conference, stating that the Company had visibility into "continuing demand [for vaccines] into [2023]" and that vaccines were "an enduring franchise for Catalent."

79.     On February 1, 2022, Catalent filed its quarterly report for the second fiscal quarter 2022 (the "2Q22 10-Q") with the SEC. The 2Q22 10-Q reported that Catalent generated $1.217 billion in net revenue and $97 million in net earnings for that quarter.

80.     The same day, Catalent hosted an earnings call with analysts and investors to discuss results from the second fiscal quarter 2022 (the "2Q22 Earnings Call"). During the 2Q22 Earnings Call, Defendant Maselli claimed that Catalent's "long-term strategic plan does not assume that the pandemic-related demand for vaccines will continue in [future] years." Defendant Maselli also stated that he believed Catalent has "always been very, very thorough in

collaboration with all the regulatory agencies."

81.    On May 3, 2022, Catalent filed its quarterly report for the third fiscal quarter 2022 (the "3Q22 10-Q") with the SEC. The 3Q22 10-Q stated that Catalent generated $1.273 billion in net revenue and $141 million in net earnings during the quarter.

82.    Also on May 3, 2022, Catalent hosted an earnings call with analysts and investors to discuss results from the third fiscal quarter 2022 (the "3Q22 Earnings Call"). During the 3Q22 Earnings Call, Defendant Chiminski reported that "[d]emand remain[s] strong in [the Biologics] segment, including a notable increase from several of our large gene therapy customers for viral vector manufacturing." He also noted that Catalent "project[ed] . . . continued demand in the years ahead."

83.    Also during the 3Q22 Earnings Call, then-CFO Castellano responded to a question asking if Catalent was seeing its customers build stockpiles in the products Catalent offers, stating, "I'm certainly not hearing or seeing that . . . [N]ot something I'm seeing or hearing across the business." In response to the same question, Defendant Maselli reported "[W]e are not seeing that happening across the board. I believe that this is also due to the fact that many areas, at the end, the demand of the market is really strong. So we are now refocusing on making sure that the market is served with all capacity that we are deploying in those high-demand areas."

84.    Further, during the 3Q22 Earnings Call, Castellano responded to a question regarding the decline in Catalent's COVID-19 business, stating that Catalent had "considerably derisked the overall contributions here . . . as part of the fiscal '23 and continue to have a line of sigh to growth despite that declining demand profile of COVID-related vaccine revenue to the 8% to 10% long-term growth target that we have in place for the consolidated company."

85.     The statements detailed above were materially false and misleading and omitted material adverse facts regarding Catalent's business, operations, and its future prospects. Specifically, the statements misrepresented or failed to disclose the following adverse facts: (i) Catalent, in violation of U.S. GAAP, materially overstated its revenue and earnings by prematurely recognizing revenue; (ii) Catalent had material weaknesses in its internal controls over financial reporting related to revenue recognition; (iii) Catalent falsely represented demand for its products while it knowingly sold more product to its direct customers than could be sold to healthcare providers and end consumers; and (iv) in its effort to rapidly produce excess inventory, Catalent disregarded regulatory rules at key production facilities, including its Brussels and Bloomington Facilities.

***The Truth Emerges***

86.     On August 29, 2022, Catalent disclosed its financial results for the fiscal year ended June 30, 2022. Despite its previous representations regarding sustained demand for its products and services, the Company reported that sales fell below consensus expectations because demand for its COVID-related products and services was facing substantial headwinds. In response to this news, Catalent's stock dropped roughly 7.4%, or $7.42 per share, to close at $92.28 per share on August 29, 2022.

87.      The Individual Defendants, however, continued to make or cause to be made materially false and misleading statements related to Catalent's revenue and earnings, as well as demand for its products.

88.     On August 29, 2022, the Company filed its annual report for the fiscal year ended June 30, 2022 (the "2022 10-K") with the SEC. The 2022 10-K was signed by Defendants Maselli, Chiminski, Balachandran, Barber, Carroll, Classon, Crane, Greisch, Kreuzburg, Lucier,

Morel, Stahl, and Zippelius. In the 2022 10-K, Catalent reported fiscal year revenues of $4.828 billion and net earnings of $519 million.

89.     The 2022 10-K further reported:

We operate our plants in accordance with current good manufacturing practices ("cGMP") or other applicable requirements, following our own high standards that are consistent with those of many of our large global pharmaceutical and biotechnology customers. We have approximately 1,900 employees around the globe focused on quality and regulatory compliance . . . . We believe our quality and regulatory track record to be a favorable competitive differentiator.

90.     Also on August 29, 2022, the Company disclosed its fiscal quarter results for the period ended June 30, 2022, indicating that Catalent had generated $1.313 billion in net revenue and $188 million in net earnings.

91.     Further, on August 29, 2022, the Company held an earnings call with analysts and investors to discuss results from the fourth fiscal quarter 2022 (the "4Q22 Earnings Call"). During the call, Defendant Maselli expressed that the Company had "much better visibility" on demand for its COVID-related products and services." Defendant Maselli added that Catalent had "pretty [good] visibility" of its prescription business and that the prescription business' pipeline was strong. Defendant Maselli further stated that the Company expected its growth to be primarily "driven by [its] non-COVID business."

92.     Defendant Maselli stated during the 4Q22 Earnings Call that Catalent's "growth was primarily driven by broad demand for our biologics offering, including the demand for COVID-19-related products, increased demand for our customer prescription products, and a rebound in demand for our consumer health products." The statements on the 4Q22 Earning Call represented that the Company was seeing sustained demand for many of its products, including products unrelated to COVID.

93.     The statements detailed above were materially false and misleading and omitted

23

material adverse facts regarding Catalent's business, operations, and its future prospects. Specifically, the statements misrepresented or failed to disclose the following adverse facts: (i) Catalent, in violation of U.S. GAAP, materially overstated its revenue and earnings by prematurely recognizing revenue; (ii) Catalent had material weaknesses in its internal controls over financial reporting related to revenue recognition; and (iii) Catalent falsely represented demand for its products while it knowingly sold more product to its direct customers than could be sold to healthcare providers and end consumers.

94.     The truth continued to emerge on September 20, 2022, when the *Washington Post* published the article entitled, "FDA releasing millions of Moderna boosters as states warn of shortages." According to the *Washington Post* article, the FDA had delayed the release of millions of COVID-19 vaccine booster shots filled by Catalent as a result of an inspection of the Bloomington Facility. FDA officials expressed concerns about potential contamination in vaccine vials, as the Bloomington Facility was not sufficiently sterile.

95.     In response to this news, Catalent's stock price declined by 9.3% over the next two trading sessions, to close at $79.06 per share on September 22, 2022.

96.     On November 1, 2022, Catalent released financial results for the first fiscal quarter ended September 30, 2022, reporting that net earnings had dropped to zero, compared to net earnings of $84 million in the first quarter the year prior. The Company also lowered its fiscal year 2023 revenue guidance to the range of $4.625 to $4.875 billion, down from prior guidance of $4.975 billion to $5.225 billion. The earnings miss and the adjusted guidance highlighted that the demand for Catalent's products and services was considerably weaker than the Company had previously emphasized.

97.     Also on November 1, 2022, the Company held an earnings call with analysts and

investors to discuss financial results from the quarter (the "1Q23 Earnings Call"). During this call, Defendant Maselli stated that the Company was expecting "negative P&L [profit and loss] effects" while Catalent made efforts to address the FDA's observations of regulatory violations. Following this news, Catalent's stock declined by 31.7% over the next two trading sessions, resulting in a closing price of $44.90 per share on November 2, 2022.

98.     The truth surrounding the Company's visibility into customer demand was further revealed on November 16, 2022 when, at the Stephens Investment Conference, then-CFO Castellano disclosed that Catalent's "inventory levels . . . in the month of September for the Q1 close were higher than they've ever been before in excess of $700 million.... [W]e're probably about $400 million too high right now." On this news, Catalent stock dropped by 8.5% over the next two trading sessions to close at $42.07 per share on November 17, 2022.

99.     On December 8, 2022, stock analyst firm GlassHouse, LLC issued the GlassHouse Report, detailing the numerous red flags that were indicative of Catalent's improper accounting practices. According to the GlassHouse Report, Catalent had overstated its revenues by more than $568 million during the Relevant Period through premature revenue recognition in violation of GAAP, related to product that the Company had produced but had not yet billed to its customers.

100.     The GlassHouse Report also asserted that Catalent had engaged in a deceptive business practice known as channel stuffing to inflate its sales and earnings figures by deliberately sending its direct customers more product than those customers would be able to sell during the given timeframes.

101.     The GlassHouse Report detailed several red flags revealing the improper accounting and channel stuffing schemes. Such red flags included a rapid increase in Catalent's

contract asset and inventory balances, declining customer deposits, record-low levels of stock ownership by Company insiders, and recent scrutiny of the Company's revenue accounting by regulators. Following the release of the GlassHouse Report, the Company's stock declined 3.6% to close at $45.54 per share on December 8, 2022.

102.    On May 8, 2023, Catalent issued a press release stating that the Company had "identified significant issues with its forecasts over the past year." The press release further stated that the Company "identified certain potential non-cash adjustments related to its operations in Bloomington, Indiana..." and would need more time to review this matter prior to filing its next quarterly report.

103.    On June 12, 2023, the Company filed an amended annual report with the SEC for the fiscal year ended June 30, 2022 (the "Amended 2022 10-K"). The Company reported that it had identified an error "related to the accounting treatment of a modification to a customer arrangement accounted for under ASC 606, *Revenue from Contracts with Customers* in [its] consolidated financial statements issued with respect to the fiscal year ended June 30, 2022." The Amended 2022 10-K reported that the Company had evaluated the materiality of the error and concluded that the error had not resulted in a material misstatement of its previously issued consolidated financial statements. Furthermore, the Amended 2022 10-K reported that the Company had identified a material weakness in its internal control over financial reporting related to the accounting modifications of customer agreements at the Bloomington Facility as of June 30, 2022.

***Harm to the Company***

104.    As a direct and proximate result of the Individual Defendants' misconduct, Catalent has lost and expended, and will lose and expend, millions of dollars.

26

105.    Such expenditures include, but are not limited to, legal fees associated with the Securities Action filed against the Company and its CEO, former CEO, and former CFO, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

106.    Such expenditures also include, but are not limited to, the cost of implementing measures to remediate the material weaknesses in the Company's internal control over financial reporting.

107.    Such losses also include, but are not limited to, significant compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives, and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

108.    As a direct and proximate result of the Individual Defendants' conduct, Catalent has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

109.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties by the Individual Defendants.

110.    Catalent is named solely as a nominal party in this action.  This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

111.    Plaintiff is an owner of Catalent common stock and has been a continuous shareholder of Company stock at all relevant times.

112.    Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

113.    A pre-suit demand on the Board of Catalent is futile and, therefore, excused. At the time this action was commenced, the twelve-member Board consisted of Defendants Carroll, Balachandran, Barber, Classon, Crane, Flynn, Greisch, Kreuzburg, Lucier, Maselli, Morel, and Stahl (the "Director Defendants"). As set forth below, all twelve Director Defendants are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action because they face a substantial likelihood of liability for misconduct alleged herein. Therefore, demand on the Board to institute this action is not necessary because such a demand would have been a futile and useless act.

114.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

115.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

116.    Each of the Director Defendants authorized and/or permitted false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute sch a suit even if they instituted it.

28

117.     Additionally, the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

118.     Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

119.     Defendant Maselli Defendant Ricci is not disinterested or independent. Defendant Maselli is CEO of the Company, and derives substantial compensation from his relationship with the Company. Furthermore, Defendant Maselli has been named as a defendant in the Securities Action and, therefore, faces a substantial likelihood of liability for issuing and/or authorizing the issuance of the same materially false and misleading statements at issue in this action. Defendant Maselli, therefore, cannot exercise independent business judgment regarding allegations that arise from the same misconduct alleged here and in the Securities Action. Thus, any demand upon Defendants Maselli would be futile.

120.     Defendants Greisch, Classon, Crane, and Stahl (the "Audit Defendants") serve on the Company's Audit Committee and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial accounting and reporting, the underlying internal controls and procedures over financial reporting, and audits of the financial statements. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or in form the Board of the issuance of material misstatements and omissions regarding the Company's business and the adequacy of its internal controls as alleged

above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

121.   The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct go well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Director Defendants to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Codes of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

122.   Moreover, the Director Defendants have taken no remedial action to redress the conduct alleged herein.

## COUNT I

### Against The Individual Defendants For Violations of § 10(b)
### of the Exchange Act and Rule 10b-5

123.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

124.   The Individual Defendants violated § 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

125.   The Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances

under which they were made, not misleading.

126.    The Individual Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes and artifices to defraud; (ii) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (iii) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated.

127.    The Individual Defendants acted with scienter because they (i) knew that the public documents and statements issued or disseminated in the name of Catalent were materially false and misleading; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws.

128.    The Individual Defendants, by virtue of their receipt of information reflecting the true facts of Catalent, their control over, and/or receipt and/or modification of Catalent's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning Catalent, participated in the fraudulent scheme alleged herein.

129.    As a result of the foregoing, the market price of Catalent common stock was artificially inflated. In ignorance of the falsity of the statements, stockholders relied on the statements described above and/or the integrity of the market price of Catalent common stock in purchasing Catalent common stock at prices that were artificially inflated as a result of these false and misleading statements and were damaged thereby.

130.    In addition, as a result of the wrongful conduct alleged herein, the Company has suffered significant damages, including the costs and expenses incurred in defending itself in the Securities Action and reputational harm.  The Individual Defendants, through their violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5, have exposed the Company to millions of dollars in potential class-wide damages in the Securities Action.

## COUNT II

### Against The Individual Defendants
### For Breach Of Fiduciary Duty

131.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

132.    The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, candor, loyalty, and due care.

133.    The Individual Defendants willfully ignored the obvious deficiencies in the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct the problems or prevent their recurrence.

134.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by permitting the use of inadequate practices and procedures to guide the truthful dissemination of Company news to the investing public and to the Company's shareholders, allowing or permitting false and misleading statements to be disseminated in the Company's SEC filings and other disclosures and, otherwise failing to ensure that adequate internal controls were in place regarding the serious business reporting issues and deficiencies described above. These actions could not have been a good faith exercise of prudent

business judgment to protect and promote the Company's corporate interests.

135.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

136.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

137.    Plaintiff, on behalf of Catalent, has no adequate remedy at law.

## COUNT III

### Against The Individual Defendants for Aiding and
### Abetting Breach of Fiduciary Duty

138.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

139.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted, conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

140.    Plaintiff on behalf of Catalent has no adequate remedy at law.

33

## COUNT IV

### Against The Individual Defendants for Unjust Enrichment

141.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

142.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Catalent.

143.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from Catalent that was tied to the performance or artificially inflated valuation of Catalent or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

144.    Plaintiff, as a shareholder and a representative of Catalent, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

145.    Plaintiff on behalf of Catalent has no adequate remedy at law.

## COUNT V

### Against The Individual Defendants For Waste Of Corporate Assets

146.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

147.    The Individual Defendants breached their fiduciary duties by failing to properly supervise and monitor the adequacy of the Company's internal controls, by issuing, causing the issuance of, and/or failing to correct the false and misleading statements identified herein, and by

allowing the Company to engage in an illegal, unethical, and improper course of conduct, which was continuous, connected, and ongoing at all relevant times.

148.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (a) paying and collecting excessive compensation and bonuses; and (b) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Action.

149.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

150.    Plaintiff on behalf Catalent has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Declaring that Plaintiff may maintain this derivative action on behalf of Catalent and that Plaintiff is a proper and adequate representative of the Company;

B.    Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and unjust enrichment;

C.    Directing Catalent to take all necessary actions to reform and improve its corporate governance and internal procedures to protect Catalent and its stockholders from a repeat of the damaging events described herein, including, but not limited to:

- strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

- strengthening the Company's internal reporting and financial disclosure controls;

- developing and implementing procedures for greater shareholder input

35

into the policies and guidelines of the Board; and

▪ strengthening the Company's internal operational control functions;

C.    Awarding punitive damages;

D.    Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: August 11, 2023                          **RIGRODSKY LAW, P.A.**

                                      By:    */s/ Herbert W. Mondros*
                                                Seth D. Rigrodsky (#3147)
                                                Gina M. Serra (#5387)
Of Counsel:                                     Herbert W. Mondros (#3308)
                                                300 Delaware Avenue, Suite 210
**THE SCHALL LAW FIRM**                         Wilmington, DE 19801
Brian Schall, Esq.                              Telephone: (302) 295-5310
Rina Restaino, Esq.                             Facsimile: (302) 654-7530
2409 Century Park East, Suite 210               Email: sdr@rl-legal.com
Los Angeles, CA 90067                           Email: gms@rl-legal.com
(213) 509-5739                                  Email: hwm@rl-legal.com

                                                *Attorneys for Plaintiff*